[Cite as *State v. Coleman*, 2012-Ohio-6042.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                   :

    Plaintiff-Appellee                      :            C.A. CASE NO.   25248

v.                                              :            T.C. NO.   10CR3660/1

MARVIN COLEMAN                                  :            (Criminal appeal from
                                          Common Pleas Court)

    Defendant-Appellant                     :

                                                :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    21st    day of     December    , 2012.

. . . . . . . . . .

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W.
Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

THOMAS M. KOLLIN, Atty. Reg. No. 0066964, 2661 Commons Blvd., Suite 214,
Beavercreek, Ohio 45431
        Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}** Defendant-appellant Marvin Coleman appeals a judgment of the

Montgomery County Court of Common Pleas, General Division, overruling his motion to suppress filed on June 7, 2011. A hearing was held before the trial court on said motion on March 13, 2012. The trial court issued its decision overruling Coleman's motion to suppress on April 3, 2012. Coleman filed a timely notice of appeal with this Court on June 18, 2012.

{¶ 2} The incident which forms the basis of the instant appeal occurred on August 17, 2010, when Detective Diane Taylor of the Montgomery County Sheriff's Office received an anonymous Crime Stoppers tip regarding the existence of a marijuana grow operation in the basement of a residence located at 232 Turner Road in Harrison Township, Ohio. Upon receiving the tip, Det. Taylor accessed a Montgomery County real estate website which indicated the residence located at 232 Turner Road did, in fact, have a basement. In light of this information, Det. Taylor executed an affidavit which she presented to a Dayton Municipal Court judge requesting that a court order be issued compelling Dayton Power and Light (DP&L) to produce records regarding the electricity usage of the current resident at 232 Turner Road. The judge signed the order, and Det. Taylor served the court order on DP&L headquarters, which is located in the City of Dayton. The records established that the electricity usage at the 232 Turner Road residence was presently almost triple the amount it had been a "year or two ago" during the same season of the year. The records also demonstrated that the electricity usage at the subject residence was high in comparison to a similar residence of the same size.

{¶ 3} On August 25, 2010, Det. Taylor applied for a search warrant to deploy the use of a thermal image scanner at the 232 Turner Road residence. A thermal image scanner

is used to detect and analyze heat levels being emitted from a residence or other structure. Det. Taylor obtained the search warrant for the use of the thermal image scanner from a judge in the Vandalia Municipal Court, which has jurisdiction over Harrison Township. After securing the warrant, Det. Taylor, accompanied by two police officers and Harrison Township firefighter Tony Davis, entered upon the property (not the residence) at 232 Turner Road and scanned the house using the thermal imaging device. Det. Taylor testified that the thermal imager recorded heat coming from the basement of the residence. Additionally, Det. Taylor testified that while on the property, she and the other officers smelled the strong scent of raw marijuana emanating from an air conditioning vent near the bottom of the house.

{¶ 4}   Based on the information gathered during the execution of the first warrant, Det. Taylor applied for a second warrant to search the residence located at 232 Turner Road for evidence regarding the cultivation and possession of marijuana. Several officers and detectives had remained at the residence while Det. Taylor left to secure the second warrant. The search warrant was issued by the same Vandalia Municipal Court judge who had issued the first warrant. Upon returning to the residence in order to execute the warrant, Det. Taylor observed that Coleman was already outside the residence and had been placed in the rear of a police cruiser. Det. Taylor testified that she was unsure if Coleman was initially provided with a copy of the search warrant, but she testified that she informed him of the existence of the warrant to search the residence. The police then executed the warrant, searched the residence, and discovered evidence of drug activity, to wit: a marijuana grow operation.

{¶ 5} After completing the search and inventory of the residence, which took approximately three to four hours to complete, Det. Taylor went to the county jail in order to interview Coleman. Det. Taylor testified that she introduced herself to Coleman and obtained information from him regarding his employment and whether he was married. Det. Taylor further testified that just as she was attempting to inform Coleman of his *Miranda* rights, he stated that his wife did not live at the 232 Turner Road residence with him. Coleman also stated that the marijuana found at the residence was for personal use because they both liked to smoke marijuana. At this point, Det. Taylor finished reading Coleman his *Miranda* rights. Coleman invoked his right to counsel, and Det. Taylor concluded the interview.

{¶ 6} On February 8, 2011, Coleman was indicted for one count of illegal cultivation of marijuana (in an amount equal to or exceeding 5,000 grams but less than 20,000 grams), a felony of the third degree, with a one-year firearm specification attached; possession of marijuana (in an amount equal to or exceeding 5,000 grams but less than 20,000 grams), a felony of the third degree, with a one-year firearm specification attached; possession of cocaine (in an amount equal to or exceeding twenty-five grams but less than 100 grams), a felony of the third degree, with a one-year firearm specification attached; possession of hashish, a felony of the fifth degree, with a one-year firearm specification attached; possession of criminal tools, a felony of the fifth degree; and possession of drug paraphernalia, a misdemeanor of the fourth degree.

{¶ 7} As previously stated, Coleman filed a motion to suppress on June 7, 2011, which the trial court subsequently overruled. On April 26, 2012, Coleman pled no contest to illegal cultivation of marijuana (in an amount equal to or exceeding 5,000 grams but less

than 20,000 grams). The State dismissed the remaining counts in the indictment and the firearm specifications. The trial court subsequently sentenced Coleman to a prison term of eighteen months, but stayed imposition of the sentence pending the outcome of the appeal.

{¶ 8} It is from this judgment that Coleman now appeals.

{¶ 9} Coleman's first assignment of error is as follows:

{¶ 10} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE BY FINDING THE COURT ORDER FOR RECORDS WAS A PROPER EXECUTION OF JUDICIAL AUTHORITY."

{¶ 11} In his first assignment, Coleman contends that the Dayton Municipal Court judge did not have jurisdiction to issue a court order to compel DP&L to release the electrical usage information for the residence located at 232 Turner Road in Harrison Township.

{¶ 12} In regards to a motion to suppress, "the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (2d Dist. 1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994). The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac,* 2d Dist. Montgomery No. 20662, 2005-Ohio-3733, ¶ 8, citing *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d Dist. 1994). Accepting those facts as true, the appellate court must then determine, as a matter of law and without deference to the trial court's legal conclusion, whether the

applicable legal standard is satisfied. *Id.*

**{¶ 13}** R.C. 1901.02(A) states in pertinent part:

**{¶ 14}** "The municipal courts established by section 1901.01 of the Revised Code have jurisdiction within the corporate limits of their respective municipal corporations ***."

**{¶ 15}** R.C. 1901.03 defines a "territory" as "the geographical areas within which municipal courts have jurisdiction." Specifically, Coleman argues that the Dayton Municipal Court judge did not have jurisdiction to sign the court order for Det. Taylor to obtain the DP&L records for a residence located in Harrison Township which is outside the "territory" in which it is permitted to adjudicate. It is undisputed that Harrison Township is within the jurisdiction of the Vandalia Municipal Court. Coleman also points out that Det. Taylor's affidavit in support of her court order did not include the information that DP&L's headquarters is located in the City of Dayton.

**{¶ 16}** In her affidavit in support of her court order, Det. Taylor submitted the following information, in pertinent part:

**{¶ 17}** "On August 17, 2010, Miami Valley Crime Stoppers received a drug complaint through Tipsoft (an anonymous narcotic tip line). The complainant stated that subjects living at 232 Turner Road *in Dayton, Ohio* are growing a large crop of marijuana in the basement of their home. ***

**{¶ 18}** "The Affiant is requesting subscriber information from [DP&L] and electric usage from 232 Turner Road, from the time the current subscriber moved in until present." (Emphasis added).

**{¶ 19}** We note that although the affidavit states that the residence is located in

Dayton, Ohio, both parties acknowledge that 232 Turner Road is in Harrison Township. At the suppression hearing, Det. Taylor testified that the residence was in the jurisdiction of the Vandalia Municipal Court. The court order, however, was directed to DP&L, not the residence or its occupants located at 232 Turner Road in Harrison Township. Significantly, Det. Taylor testified that she went to the Dayton Municipal Court to obtain the court order for the electricity usage records because the records were located at DP&L headquarters, which is situated in the City of Dayton. It is undisputed that the Dayton Municipal Court's territorial jurisdiction extends to records which are maintained in the City of Dayton. The fact that Det. Taylor mistakenly forgot to include the Dayton, Ohio address of DP&L's headquarters is not fatal to her affidavit in support of the court order. Furthermore, the affidavit mistakenly averred that the 232 Turner Road address was in the City of Dayton, which would have led the trial court in good faith to believe it could invoke its felony jurisdiction under R.C. 1901.20(B), which states as follows:

{¶ 20} "(B) The municipal court has jurisdiction to hear felony cases committed within its territory. In all felony cases, the court may conduct preliminary hearings and *other necessary hearings prior to the indictment of the defendant* or prior to the court's finding that there is probable and reasonable cause to hold or recognize the defendant to appear before a court of common pleas, and may discharge, recognize, or commit the defendant."[1] (Emphasis added).

---

[1] Although we disagree with Coleman's characterization of the order to DP&L as a search warrant, we note that the trial court would have had authority under Crim. R. 41(A) to issue a search warrant independently of R.C. 1901.20(B).

{¶ 21} Thus, the trial court did not err when it granted the court order directing DP&L to turn over the electricity usage records for the residence in question.

{¶ 22} Coleman also argues that based on the information contained in Det. Taylor's affidavit, the Dayton Municipal Court lacked probable cause to grant the court order for the DP&L electricity usage records for 232 Turner Road. Initially, we note that the State argues that Coleman failed to raise this issue in his motion to suppress before the trial court. Upon review, we find that Coleman did, in fact, assert that the court order was not supported by probable cause. Coleman, however, referred to the court order as a search warrant.

{¶ 23} "The touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy." *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986). The Supreme Court "has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *United States v. Miller*, 425 U.S. 435, 443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (holding that a bank depositor has no legitimate expectation of privacy in copies of checks and deposit slips retained by his bank); *Smith v. Maryland*, 442 U.S. 735, 744, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (holding that "[w]hen [defendant] used his phone, [he] voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business").

{¶ 24} In *U.S. v. McIntyre*, 646 F.3d 1107 (8th Cir.2011), the court held that the

defendant did not have a reasonable expectation of privacy protected by the Fourth Amendment in electricity usage records for his residence, which police obtained serving a county attorney subpoena on the electric utility. Specifically, the court found that when the defendant used power in his home, he voluntarily conveyed that information to the electric utility supplying his power. *Id*. As a result, the court held that he had no reasonable expectation of privacy in his power records, meaning that law enforcement officer did not need probable cause to obtain the records. *Id*.

{¶ 25} Similar to the defendant in *McIntyre*, when Coleman used electricity at the 232 Turner Road residence, he voluntarily conveyed that information to DP&L. Thus, Coleman had no reasonable expectation of privacy in the records of his electricity usage. Therefore, Det. Taylor did not need probable cause in order to obtain the records, and the municipal court did not err when it granted the court order directing DP&L to turn over the electricity usage records.

{¶ 26} Coleman's first assignment of error is overruled.

{¶ 27} Coleman's second assignment of error is as follows:

{¶ 28} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY DENYING APPELLANT'S MOTION TO SUPPRESS BY FINDING THAT THE SEARCH WARRANT FOR THERMAL IMAGING WAS SUPPORTED BY PROBABLE CAUSE."

{¶ 29} In his second assignment, Coleman argues that the trial court erred by finding that the first search warrant for thermal imaging at the 232 Turner Road residence was supported by probable cause. Specifically, Coleman asserts that the DP&L records

were tainted information because the Dayton Municipal Court was without jurisdiction to grant the court order.

{¶ 30}  "In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph one of the syllabus, following and quoting *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

{¶ 31}  "In reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by a magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a *de novo* determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant.  Rather, the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *Id*. at paragraph two of the syllabus (citation omitted).

{¶ 32}  We have already determined that the Dayton Municipal Court possessed the

requisite jurisdiction to grant the court order permitting Det. Taylor to obtain the electricity usage records for the residence in question. Based on the anonymous tip regarding the presence of a large marijuana grow operation, the existence of a basement at the residence, and the DP&L records which established that the electricity usage at the residence had recently tripled, the municipal court judge possessed a substantial basis for concluding that probable cause existed to permit Det. Taylor to scan the interior of the residence with the thermal imaging device. Accordingly, the Vandalia Municipal court judge did not err when she issued the first search warrant requested by Det. Taylor.

{¶ 33} We note that section E of the affidavit to the first search warrant specifically states that in order to use the thermal imager, they "will need to enter the property to get a reading of heat from the residence." The affidavit also notes that "there will be no entry into the physical residence[;] the reading will be done from outside." Additionally, the first search warrant provides that "[t]he area the thermal imager is to be used is on the primary residence, the unattached garage and any outbuilding." Clearly, the judge who issued the search warrant gave the police permission to enter the curtilage of the property during the execution of the search warrant in order to detect any heat emanating from the primary residence, garage, and any other outbuilding. Otherwise, the search warrant permitting the thermal scan would have been impracticable. It is significant that neither Det. Taylor nor any of her team entered any of the buildings named in the search warrant. The house and garage were merely scanned from the outside with the thermal imager. Accordingly, the police were lawfully on the curtilage of the property and not trespassing when they smelled the odor of raw marijuana emanating from a vent near the bottom of the house and received

a high reading on the thermal imager.

{¶ 34}  Coleman's third assignment of error is as follows:

{¶ 35}  "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY DENYING APPELLANT'S MOTION TO SUPPRESS BY FINDING THAT THE SEARCH WARRANT FOR THE RESIDENCE AT 232 TURNER ROAD WAS SUPPORTED BY PROBABLE CAUSE WHEN THE AFFIDAVIT PRESENTED CONTAINED UNLAWFULLY OBTAINED EVIDENCE."

{¶ 36}  In his third assignment, Coleman contends that the trial court erred when it found that   the search warrant for the residence located at 232 Turner Road was supported by probable cause.  Specifically, Coleman asserts that the affidavit for the search warrant contained unlawfully obtained evidence.  Coleman argues that the thermal image results which uncovered a hot spot in the basement were unlawfully obtained through the use of the prior tainted warrant.  Coleman also asserts again that the officers were trespassing on the curtilage of the property when they smelled the odor of raw marijuana coming from the basement.

{¶ 37}  We have already determined that the police possessed sufficient probable cause in order to execute a search warrant to perform a thermal scan of the residence. Based on the results from the thermal scan, Det. Taylor discovered a heat source emanating from the basement.  In the course of deploying the thermal imager, Det. Taylor and the other police officers detected the odor of raw marijuana emanating from a vent near the bottom of the house.  In light of these discoveries, Det. Taylor prepared a second affidavit and obtained a second warrant to search the interior of the primary residence and any

outbuildings located at 232 Turner Road. Thereafter, Det. Taylor discovered assorted contraband and evidence of a marijuana grow operation.

{¶ 38} Upon review, we find that the municipal court judge possessed a substantial basis upon which to conclude that there was a fair probability that evidence of marijuana cultivation would be found inside the residence at 232 Turner Road. In addition to the lawfully discovered evidence discussed in the previous assignments of error, the evidence before the judge consisted of a positive heat reading from a thermal imager scan of the residence as well as the smell of raw marijuana emanating from a vent near the bottom of the primary residence on the subject property. Accordingly, the second affidavit submitted by Det. Taylor provided the municipal court judge with sufficient probable cause to issue the subsequent warrant which permitted a search of the interior of the subject residence and outbuildings located at 232 Turner Road.

{¶ 39} Coleman's third assignment of error is overruled.

{¶ 40} Coleman's fourth and final assignment of error is as follows:

{¶ 41} "THE TRIAL COURT ERRED IN NOT SUPPRESSING APPELLANT'S STATEMENT TO DETECTIVE TAYLOR WHERE APPELLANT WAS NOT ADVISED OF HIS *MIRANDA* RIGHTS."

{¶ 42} In his final assignment, Coleman argues that the trial court erred when it ruled that inculpatory statements he made to Det. Taylor were admissible because he was not properly advised of his *Miranda* rights.

{¶ 43} At the suppression hearing, Det. Taylor testified as follows regarding the events surrounding Coleman's unsolicited admission:

The State: Okay. After you had completed the search of 232 Turner Road did you have occasion to attempt an interview of the Defendant, in this case, Marvin Coleman?

Det. Taylor: Yes, sir.

Q: And where did that occur?

A: That occurred [on] the first floor county jail in the large interview room.

Q: Okay. Were you yourself the one that conducted this interview?

A: Yes, I was.

Q: Okay. Tell us how it proceeded. Was the Defendant, Marvin Coleman, in custody at this point?

A: Yes, he was.

Q: Okay. And were you attired as a sheriff's deputy in a uniform?

A: No, plain clothes. Blue jeans more than likely.

Q: Okay. Did you identify yourself as a sheriff's office detective when you made contact with the Defendant?

A: Yes, I did.

Q: All right. Was he in an interview room?

A: Yes.

Q: And was anyone else present other than you and the Defendant when you began this interview?

A: I don't believe so, no.

Q: How did you begin the interview?   Did you introduce yourself?

A: I introduced myself.   I obtained a little bit of background information on him, where he worked, if he was married.   I then read him his *Miranda* rights for a pre-interview form provided by the sheriff's office.

Q: Prior to you interviewing or prior to you reading the Defendant his *Miranda* rights, did he make any, excuse me, spontaneous statements to you before you began reading the rights?

A: Yes, he did.

Q: And what did he tell you?

A: He told me that his wife did not live there and he said that the marijuana that was found in his home was for personal use, that they both like to smoke marijuana.

Q: Okay.   *Was that in response to any questioning that you had posed to the Defendant?*

A: *No, sir.*

Q: All right.   After he makes this statement you then read him his *Miranda* rights?

A: I read him each one of his *Miranda* rights and after I finished reading the rights I asked him if he understood his rights and he stated he did, so I had him initial by each of his rights that he

understood them. I then read him the waiver of rights. I asked him

if he understood the waiver of rights which he stated he did and he

initialed by that. I had him fill in his years of schooling. And then at

that time he stated he wanted an attorney and I concluded the

interview. (Emphasis added).

{¶ 44} Interrogation includes express questioning as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *State v. Fair*, 2d Dist. Montgomery 24120, 2011-Ohio-3330, ¶ 40, citing *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 16 (2d Dist.) and *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). But "[p]olice officers are not responsible for unforeseeable incriminating responses." *Fair* at ¶ 40, citing *State v. Waggoner*, 2d Dist. Montgomery No. 21245, 2006-Ohio-844, ¶ 14. Statements made on the subject's own initiative, in the absence of questions or other conduct by police, do not constitute "interrogation." *State v. Johnson*, 2d Dist. Montgomery No. 20624, 2005-Ohio-1367, ¶ 25, citing *City of Akron v. Milewski*, 21 Ohio App.3d 140, 487 N.E.2d 582 (9th Dist.1985).

{¶ 45} Upon review, we conclude that the record supports the trial court's conclusion that Coleman's inculpatory admission regarding the contraband discovered in his residence was clearly voluntary and spontaneous and was not made as a result of any questioning by Det. Taylor. While it is undisputed that Coleman was in custody at the time of the interview in the jail, his admissions were not made as a result of custodial

interrogation and were made prior to his invocation of his *Miranda* rights.   Accordingly, the trial court did not err when it found that Coleman's statement to Det. Taylor was admissible.

{¶ 46}   Coleman's fourth assignment of error is overruled.

{¶ 47}   All Coleman's assignments having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Michele D. Phipps
Thomas M. Kollin
Hon. Frances E. McGee